In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-24-00169-CV
_____

TEXAS STATE TECHNICAL COLLEGE SYSTEM, Appellant

V.

TED H. DONAVAN, Appellee

On Appeal from the 414th District Court
McLennan County, Texas
Trial Cause No. 2018-1968-5

MEMORANDUM OPINION

Ted H. Donavan sued Texas State Technical College System ("TSTC") for employment discrimination under the Texas Commission on Human Rights Act ("TCHRA"). *See generally* Tex. Lab. Code Ann. §§ 21.001–.556. He asserted claims for disability discrimination, failure to accommodate, and retaliation. TSTC filed a combined evidence-based Plea to the Jurisdiction and Motion for Summary Judgment, which the trial court granted as to Donavan's retaliation claim but denied as to his disability discrimination and failure to accommodate claims. In this

1

interlocutory appeal, TSTC challenges the trial court's partial denial of its evidence-based Plea to the Jurisdiction.[1] *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(8) (allowing for an immediate appeal from interlocutory order denying a governmental unit's plea to the jurisdiction). In one issue, TSTC asks whether the trial court erred in denying its Plea to the Jurisdiction as to Donavan's disability discrimination claim because TSTC had a legitimate, non-discriminatory reason for his termination and Donavan failed to establish a prima facie case for that claim. As discussed more fully below, we reverse the trial court's order denying the Plea to the Jurisdiction and render judgment dismissing Donavan's claims.

## I. Background

### A. Donavan's Employment with TSTC and 2016 Evaluation

Donavan began working for TSTC in 2001, and in February 2001, he began working in their Network Services Department. In 2015, he was transferred to the Business Intelligence Department where he worked as a data analyst until his termination. In January 2015, Donavan was diagnosed with prostate cancer and completed treatments for the prostate cancer in April 2015. While undergoing treatment, he also received medication "just for the nausea." Donavan testified that he had side effects from the prostate cancer, including hot flashes, nausea, cramps,

---

[1] This case was transferred to this Court from the Tenth Court of Appeals in Waco, Texas pursuant to a docket equalization order. *See* Tex. Gov't Code Ann. § 73.001.

2

dizziness, and sweating. In 2015, after reading an article on the American Cancer Society website, Donavan began meditating during treatment to help with the side effects. Donavan testified that he informed Terry Conroy, who was his supervisor at that time, and several people in the Human Resources Department ("HR") in January 2015 that he was undergoing cancer treatment, but he did not ask for any accommodations at that time. He explained, "I remember for sure that one time when I was meditating, I had my neck back, and [Conroy] walked in, and I opened my eyes. She started talking to me. If I knew somebody was there or looking for me, it wasn't a problem." He believed he submitted a letter to HR from the diagnosing doctor at that time saying he had cancer but did not know if it was in his personnel file and never followed up. Conroy told Kelly Contella in HR via email that in 2015, "Ted did indicate to me he had a serious medical condition and would need treatments. I don't recall the condition and don't recall him asking me to complete any forms. He didn't request any accommodations."

Donavan said he meditated for ten to fifteen minutes, one to three times per day, usually in the morning. He also claimed that Conroy walked in on him meditating several times. He described meditating as closing his eyes, breathing deeply, leaning back in his chair, and relaxing for ten or fifteen minutes. Donavan testified that Conroy sometimes came in while he was leaning back with his eyes

3

closed, usually with the lights off; other times he would focus on a painting on his wall.

In September 2016, Donavan's department was consolidated with the Budget Department, and Isabel Weeden became his supervisor. In November 2016, shortly after she became his supervisor, Weeden gave him a negative performance evaluation using a form she created and scored him 78 out of a possible 210. The record reflects that he was never written up or disciplined while working for TSTC, and before Weeden's 2016 evaluation, he had received positive employment reviews. Donavan disagreed with this evaluation and testified that he told Weeden in the November 2016 evaluation meeting, "I just want to let you know that I've had cancer." He also claimed that Weeden responded with a sympathetic "oh" but did not inquire further. Donavan testified he told Weeden that "the cancer seems to be fine, . . . but I have a lot of doctors' appointments and suffer from side effects." Donavan admittedly did not tell Weeden that he was meditating at work at this time. The record does not suggest that he told Weeden what specific side effects he experienced.

Weeden said she never talked to Donavan about any health issues and explained the only time he mentioned it was "in the performance evaluation in November, he stated that he had had cancer in the past but was in full remission." Donavan did not tell her what kind of cancer or why he brought it up, and she did

4

not ask. Donavan did not state the cancer was giving him any problems and nobody else told her it was, but he said that he had doctor's appointments occasionally. Weeden testified that in November 2016, Donavan said he was in full remission, so the appointments were just checkups.

**B. Events Leading to Termination**

In late July 2017, Weeden learned Donavan was sleeping on the job when another employee in their group, Jay Gerik, told Weeden that she witnessed him sleeping multiple times. When Gerik first came to Weeden, she told Weeden that three other employees had seen him sleeping who later provided statements: Tracey Bredemeyer; Tina Skidmore; and Amy Trice. After Gerik reported him sleeping, in late July 2017, Weeden called Contella in HR to ask for advice about what to do. Contella gave Weeden several options, including terminating Donavan or writing him up. Weeden testified she chose to terminate him, and it was discretionary.

Contella also asked Weeden if other employees witnessed the behavior, and instructed Weeden to get statements from them, if so. The record includes the coworkers' written statements which show that they separately observed Donavan sleeping on various dates in June and July 2017, and some witnessed him sleeping more than once. Weeden obtained the statements from the other employees before she terminated Donavan, but it was only a matter of days between when she first heard about it to when she terminated him. When Weeden received the statements,

5

she scanned them and sent them to Contella. After sending the statements to Contella, Weeden spoke with Contella several times before she fired Donavan.

Weeden also spoke with her supervisor, Jonathan Hoekstra, before terminating Donavan and told him that several employees told her that they witnessed Donavan sleeping. She discussed Donavan's prior performance with Hoekstra and the options HR had given her. Weeden explained that she and Hoekstra talked about Donavan's performance, specifically that she could not assign Donavan full responsibilities, because he never correctly completed a task and provided an example. According to Weeden, Donavan's difficulty completing tasks began in September when he started in the division. Weeden described having to take Donavan off certain assignments, including TWC data, because he could not properly pull and arrange it, and explained, "He did not appear to have the competency to do that." He had also violated TWC protocols. She testified that she tried to give him other assignments that were not as sensitive, but he could not do those either.

Weeden said that in terms of supervision, she spoke with her supervisor, Hoekstra, and she spoke with Contella and Hannah Love, who oversaw HR. She talked to them about both Donavan sleeping and that based on his prior performance considering recent events what was the best decision.

6

## C. Termination

On August 2, 2017, Donavan was called into HR for a meeting with Weeden and Contella. Weeden told him it had been reported that he was sleeping on the job. He responded to Weeden that he was not sleeping, rather he was meditating and reminded her that he told her he had cancer and thought he said, "I have medical issues." He explained to Weeden, "[I]t's more meditation in a trance-like state . . . it's because of my nausea, dizziness, and sweating." According to Donavan, Contella asked him why he did not tell them before, and he told her that he did; then, Weeden turned the termination letter around and told him to sign it. He clarified that he had not previously told Contella but had told Weeden about the cancer. Donavan testified he had not told anyone before the termination meeting that he was meditating.

## D. Donavan's Claims

Donavan sued TSTC for disability discrimination, retaliation, and failure to accommodate. He asserts that he "was taking medications as a result of prostate cancer (with low testosterone), high blood pressure, and diabetes, which caused the impairment of several frequent symptoms and side effects including nausea, hot flashes, sweating, dizziness, cramping, and impairment, at times, of the ability of his mind to concentrate." He further alleges that when the side effects overcame and impaired him, "he used a type of biofeedback (self-hypnosis) recommended by the

7

American Cancer Society" to help with the nausea and side effects. He claims he engaged in this practice for "short periods" while at work "on almost a daily basis." Donavan pleaded that he

> had the medical conditions of prostate cancer (with low testosterone), high blood pressure, and diabetes, which were substantially impairing/limiting "disabilities" (as that term is defined by Chapter 21 of the Texas Labor Code), and/or treatments for them, at times caused substantially impairing/limiting side effects, including nausea, hot flashes, sweating, dizziness, cramping; and interfered, for short periods of time, with the ability of his mind to concentrate.

Donavan asserts the disabilities "substantially limited" one or more "major life activities" by interfering with his ability to concentrate.

He also alleges he was qualified for the job of computer systems analyst but needed a reasonable accommodation, which TSTC refused. Regarding his disability discrimination claim, he "alleges that a motivating factor for Defendant terminating him was because of his disabilities, regarding him as disabled, and/or his record of disabilities." As to his retaliation claim, Donavan "also alleges that Defendant retaliated against Plaintiff by terminating his employment for using an accommodation, or requesting a reasonable accommodation, for his impairing disabilities[.]"

**II. Plea to the Jurisdiction and Motion for Summary Judgment Record**

**A. TSTC's Plea to the Jurisdiction and Motion for Summary Judgment**

TSTC filed a combined Defendant's Plea to the Jurisdiction and Motion for Summary Judgment based on sovereign immunity, which for ease of reference we refer to as a motion to dismiss. *See Tex. Dep't of Transp. v. Lara*, 625 S.W.3d 46, 51 (Tex. 2021) (explaining it would refer to combined plea to the jurisdiction and motion for summary judgment as "motion to dismiss" for "ease of reference"). TSTC moved to dismiss and supported its motion with evidence, arguing that Donavan cannot show the essential elements of his claims, which are jurisdictional, so his suit must be dismissed. The motion to dismiss also included traditional and no-evidence motions for summary judgment. As to his claim for disability discrimination, TSTC argues that "Donavan cannot carry his burden of establishing a prima facie case for his claims or that TSTC's reasons for terminating Donavan are pretext for discrimination."

As applicable here, for both the failure to accommodate claim and the disability discrimination claim, TSTC contends that Donavan did not have a disability that substantially limits a major life activity. It adds that the relevant inquiry is whether he was disabled at the time of the adverse employment action. Regarding the failure to accommodate claim, TSTC further contends in its motion

9

to dismiss that it did not have notice of Donavan's disability, and it did not refuse to make an accommodation since Donavan failed to request one.

As for the disability discrimination claim, TSTC asserts that even if "Donavan has established a prima facie case of disability discrimination, the court still must dismiss his claims for lack of subject-matter jurisdiction because Donavan cannot provide sufficient evidence to show that TSTC's reasons for terminating his employment were mere pretext for intentional discrimination[.]" TSTC points to the *McDonnell Douglas* burden-shifting framework and asserts that even if Donavan proves he had a disability, it established a legitimate, non-discriminatory reason for terminating him. TSTC argues that its burden is one of production, not persuasion, to establish a legitimate, non-discriminatory reason for its employment decision, which was Donavan sleeping on the job. Once that happens, the burden shifts back to Donavan to establish that was not the real reason for his termination—i.e., pretext.

TSTC supported its motion to dismiss with the following evidence: Donavan's deposition; Weeden's deposition; Contella's deposition; Hoekstra's deposition; Donavan's 2016 Performance Evaluation; co-workers' statements that they observed Donavan sleeping at work; letter terminating Donavan; and Donavan's TWC Charge.

**B. Donavan's Response to the Plea to the Jurisdiction and Motion for Summary Judgment**

Donavan filed his Plaintiff's Response to Defendant's Plea to the Jurisdiction, which he supported with evidence.[2] In his Response, Donavan argues that TSTC fired him when it was aware "he was undergoing treatment for prostate cancer and the negative effects" it had on him. Donavan asserts the "evidence creates a fact issue on each of [his] claims, and that TSTC's proffered reason for firing was mere pretext for unlawful discrimination." He points to the fact that he had never been disciplined at work and that until Weeden, he had "excellent performance reviews under multiple supervisors."

Donavan contends: (1) he has a disability; (2) he was qualified for the job; and (3) was subject to an adverse employment action because of his disability.

---

[2]In his Response, Donavan asserts that he did not believe TSTC challenged his disability claim in its motion to dismiss and may have only challenged the failure to accommodate claim. We disagree. Although the subheadings in TSTC's motion to dismiss are not the model of clarity, in substance, it challenges that Donavan had a disability, it argues he cannot establish a claim for discrimination and specifically that he cannot show they terminated him due to his disability. It also points to the *McDonnell Douglas* burden-shifting framework, asserting that even if Donavan proved a prima facie case, it had the legitimate, non-discriminatory reason of terminating him for sleeping on the job, and that when the burden shifted back to him, he failed to establish the reason was pretext. Accordingly, we conclude TSTC effectively challenged the disability discrimination in its motion to dismiss. *See Brumley v. McDuff*, 616 S.W.3d 826, 832 (Tex. 2021) (explaining in the context of a trespass to try title case that we look at the substance of the pleadings to determine the relief sought); *In re J.Z.P.*, 484 S.W.3d 924, 925 (Tex. 2016) (explaining courts should look at the substance of the relief sought).

Particularly, he counters that he has a disability "in the form of Side Effects of his diabetes, cancer, and the medications he was taking to treat these and other disorders." He argues, "The action of Donavan in closing his eyes and meditating resulted directly from his disability and was directly caused by and 'part of the disability.'" He further asserts that when Weeden terminated him for this, "which she classified as sleeping," it constituted "direct evidence" of discrimination, and alternatively if it is not direct evidence, the *McDonnell Douglas* framework applies, and he has established that TSTC's stated reason is pretext.

As to his failure to accommodate claim, Donavan asserts that in addition to having a disability, TSTC knew of Donavan's disability and failed to reasonably accommodate him and particularly failed to engage in an interactive process once it had a duty to do so. Donavan contends that Conroy, Weeden, and Contella knew he had cancer and suffered from side effects. In essence, he contends that although he did not use the word "accommodation," that it was "clear that he was asking Weeden and Contella to allow him to continue meditating and continue his job at TSTC."

In support of his Response, Donavan submitted the following evidence: Affidavit of Ted H. Donavan attaching an American Cancer Society article and a recommendation letter from TSTC's Dr. Stuckly; Donavan's deposition; Weeden's deposition; Contella's deposition; Hoekstra's deposition; Donavan's work

12

performance assessments; excerpts from TWC file;] Donavan's medical records; TSTC Faculty and Staff Handbook; and emails between Contella and Conroy.

We have summarized pertinent deposition testimony in our Background discussion above. In his affidavit, among other things, Donavan also avers:

. . .

8. In 2015, shortly after my diagnosis, I informed Terry Conroy that I had cancer and that I was undergoing treatment. We continued to work well together and she continued to give me positive feedback. Around that same time, I also had multiple conversations with individuals in Human Resources about the fact that I had been diagnosed with cancer and was undergoing treatment. I also spoke with an HR professional named Juliana Bullard. I also submitted a letter from the diagnosing doctor, Dr. Patel, and put it in a manilla envelope and transferred it to HR via campus mail.

. . .

11. In the fall of 2016, I was assigned to a new supervisor, Isabel (Bell) Weeden. A couple of months later, Ms. Weeden gave me my first bad performance review. In that meeting, I informed her that I had cancer and was undergoing treatment. I also told her that I was suffering from side effects of the cancer and the medication, my struggle dealing with those conditions, and conveyed that, while I thought I had been doing an adequate job, and was able to perform my work responsibilities, my cancer symptoms sometimes made performing my job challenging. Ms. Weeden acknowledged what I had said about my medical condition and symptoms with a sort of sympathetic, "Oh," but did not inquire further as to how she could enable me to do my job or help me succeed.

12. Ms. Weeden and I also discussed my cancer diagnosis in the spring of 2017. Once again, she acknowledged my diagnosis and did not question it, but did not offer any suggestions for us communicating better or enabling me to perform my job despite my cancer and symptoms. During this time, I continued to meditate in my office as a method of dealing with my symptoms.

13

13. In August of 2017, I was called into Human Resources, into a room with Kelly Contella and Isabel Weeden. Ms. Weeden said, "it's been reported that you're sleeping on the job." I was surprised and puzzled, and responded that I wasn't really sleeping, it was more of meditation in a trance-like state, and I was doing it for medical reasons. I explained that meditating helped me deal with the symptoms from my cancer. Ms. Contella said, "Why didn't you tell us this before?" and I responded that I had informed them about the cancer diagnosis and related symptoms, but that I did not think I needed to ask permission to meditate, because it did not impede my work, and I was not doing it more than a couple of times a day, for 15 minutes, the same as my co-workers who took coffee or smoke breaks.

14. The purpose and objective of explaining the meditation and the reasons for it to Ms. Contella and Ms. Weeden was to correct their misconception that I was sleeping on the job, to explain that this was a method by which I was able to control my cancer symptoms and perform my job in a satisfactory manner, that using this technique did not interfere with the performance of my job. The reason why I was explaining all of this to them was, I wished them to understand why I was meditating and continue to allow me to do so. Although I am not a lawyer and did not use the word "accommodation," it was quite clear, in my opinion, that I was asking Ms. Weeden and Ms. Contella to allow me to continue meditating and continue at my job at TSTC. I believe that, had they allowed me to continue meditating, it would have allowed me to continue performing all of the essential functions of my job.

15. However, Ms. Contella and Ms. Weeden did not seem to want to believe me, and insisted that I was sleeping, and that is why I was being let go. At no point during that termination meeting did either Ms. Contella or Ms. Weeden state that my termination was due to poor performance or an inability to do my job. Ms. Weeden was quite clear that the reason she was terminating me was for supposedly sleeping in my office. She presented me with a letter that similarly stated that it was reported that I had been observed sleeping on the job. I was never informed who supposedly reported this, or when. I was never given any specifics.

. . .

14

## C. TSTC'S Reply

TSTC filed Defendant's Reply in Support of its Plea to the Jurisdiction and Motion for Summary Judgment. TSTC counters that Donavan submitted no evidence that he is disabled. TSTC notes that in his deposition, Donavan only claims his cancer caused a problem, yet elsewhere claims diabetes and hypertension. TSTC further asserts there is no medical evidence that any of these conditions, and particularly prostate cancer, caused a substantial limitation in the major life activity of concentrating and thinking and no summary-judgment evidence showed that Donavan was diagnosed with nausea, dizziness, or any of the other alleged "side effects" before his termination. TSTC contends there is no admissible causation evidence – except Donavan's testimony, and he offers no evidence or medical records that his "impairments" were in fact caused by his "disabilities."

Among other things, TSTC also argues there is no evidence that Donavan was disabled at the time of his termination since his treatment ended in April 2015, and no evidence that by August 2017, he still had prostate cancer. Thus, he failed to raise a genuine issue of material fact that his prostate cancer was a disability or that he was disabled by his prostate cancer at the time of his termination. Further, TSTC asserts that there was no evidence Donavan was substantially limited in a major life activity, and he failed to present any direct evidence he was terminated due to his alleged disability. TSTC disputes that Donavan provided evidence of pretext or

15

mixed motive and notes the relevant question is whether the decision-makers had a good-faith belief that the plaintiff committed misconduct, and by articulating reasons for his termination, it met its burden. Regarding a failure to accommodate, TSTC replies that Donavan presented no evidence of a prima facie case of failure to accommodate and specifically urges that it is his burden to initiate the reasonable-accommodation discussion. Finally, TSTC argues that Donavan provided no evidence that he timely notified TSTC of any limitation.

**D. Donavan's Sur-Reply**

Donavan also filed Plaintiff's Sur-Reply in Opposition to Defendant's Plea to the Jurisdiction and Motion for Summary Judgment. He claims he presented evidence in the form of deposition testimony that he is disabled and that his own description of his symptoms was enough to show that his impairments were caused by his disabilities. He also asserts that he need not show he was disabled at the time of his termination given the intermittent impairment. In other words, the requirement that an employee have a disability at the time of the adverse employment action does not mean that the employee must be symptomatic at the time of the employment action. Donavan also contends that TSTC had a duty to engage in an "interactive process" for a reasonable accommodation once he put them on notice of his disability. He argues that he provided evidence of pretext, including TSTC's failure to follow its disciplinary procedures, Weeden's inaccurate statement to the

16

"TWCCRD," and TSTC's failure to document. Finally, he contends he made a prima facie case for his failure to accommodate claim.

## E. Trial Court's Order

The trial court granted the motion to dismiss Donavan's retaliation claim, which Donavan noted he was voluntarily dismissing in his Response to the Plea to the Jurisdiction. It denied the motion to dismiss as to the disability discrimination claim and failure to accommodate claim without stating a basis.

## III. Standard of Review

We review a trial court's ruling on a plea to the jurisdiction based on immunity from suit de novo. *See Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). A court may not decide a case unless it has subject-matter jurisdiction. *Id.* A plea to the jurisdiction challenges the trial court's power to exercise subject-matter jurisdiction. *Id.*; *see also City of Waco v. Kirwan*, 298 S.W.3d 618, 621 (Tex. 2009).

> [W]hen a challenge to jurisdiction that implicates the merits is properly made and supported, whether by a plea to the jurisdiction or by a traditional or no-evidence motion for summary judgment, the plaintiff will be required to present sufficient evidence on the merits of her claims to create a genuine issue of material fact.

*Town of Shady Shores v. Swanson*, 590 S.W.3d 544, 552 (Tex. 2019).

"Sovereign immunity from suit defeats a trial court's subject matter jurisdiction and thus is properly asserted in a plea to the jurisdiction." *Miranda*, 133

17

S.W.3d at 225–26 (citing *Tex. Dep't of Transp. v. Jones*, 8 S.W.3d 636, 637 (Tex. 1999)) (other citation omitted). "'The TCHRA waives immunity, but only when the plaintiff states a claim for conduct that actually violates the statute.'" *Lara*, 625 S.W.3d at 52 (quoting *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 770 (Tex. 2018)). When suing a governmental employer, the plaintiff's prima facie case implicates both the merits of the claim and the court's jurisdiction because of the sovereign immunity doctrine. *See Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 635–36 (Tex. 2012).

To prevail on an immunity claim, the governmental defendant may challenge (1) whether the plaintiff has pleaded facts that affirmatively demonstrate the court's jurisdiction to hear the case, (2) the existence of jurisdictional facts, or (3) both. *Lara*, 625 S.W.3d at 52 (quoting *Garcia*, 372 S.W.3d at 635) (other citation omitted). When a defendant challenges the existence of jurisdictional facts, as TSTC did here, we "must move beyond the pleadings and consider the evidence." *See id.*; *Alamo Heights*, 544 S.W.3d at 770–71. Our analysis in such cases "mirrors that of a traditional summary judgment." *Lara*, 625 S.W.3d at 52 (citation omitted); *Alamo Heights*, 544 S.W.3d at 771. "[I]f the plaintiffs' factual allegations are challenged with supporting evidence necessary to consideration of the plea to the jurisdiction, to avoid dismissal plaintiffs must raise at least a genuine issue of material fact to overcome the challenge to the trial court's subject matter jurisdiction." *Alamo*

18

*Heights*, 544 S.W.3d at 771 (citation omitted). In determining whether a material fact issue exists, we take as true all evidence favorable to the plaintiff, indulging every reasonable inference and resolving any doubts in the plaintiff's favor. *See id.* In doing so, we cannot disregard necessary contextual evidence and cannot disregard evidence and inferences unfavorable to the plaintiff if reasonable jurors could not. *See id.*

When an order granting or denying summary judgment and a plea to the jurisdiction does not specify the grounds on which the trial court relied, we must affirm if the appellant does not attack all independent grounds that may support the adverse ruling. *See Rosetta Res. Operating, LP v. Martin*, 645 S.W.3d 212, 226 (Tex. 2022) (explaining that when a trial court's summary judgment order does not specify the grounds on which its order is based, "the appeal party must negate each ground upon which the judgment could have been based"); *Shannon v. Memorial Drive Presbyterian Church U.S.*, 476 S.W.3d 612, 621 (Tex. App.—Houston [14th Dist.] 2015, pet. denied) (explaining when an order granting summary judgment or plea to the jurisdiction does not specify grounds on which the trial court relied, we must affirm if appellant does not attack all independent grounds that may support an adverse ruling or if any independent ground is meritorious). When construing issues raised on appeal, "[t]he statement of an issue or point will be treated as covering every subsidiary question that is fairly included." Tex. R. App. P. 38.1(f); *see*

19

*Horizon Health Corp. v. Acadia Healthcare Co.*, 520 S.W.3d 848, 882 (Tex. 2017) (citations omitted). We will "construe briefing reasonably, yet liberally, so that the right to appellate review is not lost by waiver." *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 222 (Tex. 2017) (internal quotations omitted). "[A]n appellant may not include in a reply brief a new issue in response to some matter pointed out in the appellee's brief but not raised in the appellant's opening brief." *Bich Ngoc Nguyen v. Allstate Ins. Co.*, 404 S.W.3d 770, 781 (Tex. App.—Dallas 2013, pet. denied) (citations omitted).

## IV. Analysis

On appeal, TSTC asserts, among other things, that Donavan failed to establish a prima facie case of disability discrimination, because he did not show he had a disability, and even if he did, it had a legitimate nondiscriminatory reason for terminating him. Regarding his failure to accommodate claim, TSTC once again asserts that Donavan failed to make a prima facie claim, because he failed to show he was disabled, it did not have notice of his need for an accommodation, and it did not refuse to accommodate where it had no notice it needed to.

### A. Applicable Law: TCHRA, Disability Definitions, and *McDonnell Douglas*

The Texas Labor Code defines disability with respect to an individual as "a mental or physical impairment that substantially limits at least one major life activity of that individual, a record of such impairment, or being regarded as having such an

20

impairment[.]" Tex. Lab. Code Ann. § 21.002(6). Disability includes "an impairment that is episodic or in remission that substantially limits a major life activity when active." *Id.* § 21.0021(a)(2). "'Major life activity' includes, . . . concentrating, [and] thinking, . . . The term also includes the operation of a major bodily function, including, but not limited to, functions of the immune system, normal cell growth, and digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." *Id.* § 21.002(11-a). The TCHRA instructs that we construe "disability" "in favor of broad coverage[.]" *Id.* § 21.0021(a)(1). It is an unlawful employment practice if an employer "because of . . . disability . . . discharges an individual, or discriminates in any other manner against an individual in connection with compensation or the terms, conditions, or privileges of employment." *Id.* § 21.051.

The TCHRA's express purposes noted in Texas Labor Code section 21.001 include to "provide for the execution of the policies of Title VII of the Civil Rights Act of 1964[,]" and to "provide for the execution of the policies embodied in Title I of the Americans with Disabilities Act and its subsequent amendments[.]" *Id.* § 21.001(1), (3). So, Texas courts look to analogous federal statutes and cases interpreting them when applying the TCHRA. *See Lara*, 625 S.W.3d at 52 (citation omitted); *see also Alamo Heights*, 544 S.W.3d at 781 (explaining that Texas case

21

law parallels federal cases interpreting and applying equivalent federal statutes in discrimination and retaliation cases under TCHRA).

A plaintiff may establish discrimination with either direct or circumstantial evidence. *See Alamo Heights*, 544 S.W.3d at 781–82; *Garcia*, 372 S.W.3d at 634, 638; *Jespersen v. Sweetwater Ranch Apartments*, 390 S.W.3d 644, 653–54 (Tex. App.—Dallas 2012, no pet.). If a plaintiff produces direct evidence of discriminatory animus, the burden shifts to the employer to prove it would have taken the same action regardless of discriminatory animus. *See Donaldson v. Tex. Dep't of Aging & Disability Servs.*, 495 S.W.3d 421, 433 (Tex. App.—Houston [1st Dist.] 2016, pet. denied); *Jespersen*, 390 S.W.3d at 653. "Direct evidence of discrimination is evidence that, if believed, proves the fact of discriminatory animus without inference or presumption." *Donaldson*, 495 S.W.3d at 433 (citation omitted); *Jespersen*, 390 S.W.3d at 653 (citing *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002)). Where an inference is required for the evidence to be probative of the employer's discriminatory animus in the employment decision, the evidence is circumstantial, not direct. *Jespersen*, 390 S.W.3d at 654. Comments that constitute direct evidence of discrimination tend to be "insults or slurs against the protected group." *Id.* (citations omitted); *see Donaldson*, 495 S.W.3d at 433.

If a plaintiff relies on circumstantial evidence to establish their discrimination claim, "we follow the burden-shifting framework the United States Supreme Court

22

established in *McDonnell Douglas Corp. v. Green*[.]" *Tex. Tech Univ. Health Scis. Ctr.-El Paso v. Flores*, 612 S.W.3d 299, 305 (Tex. 2020) (citing *Alamo Heights*, 544 S.W.3d at 764, 782); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804–05 (1973) (discussing burden-shifting framework).

> Under this framework, (1) the plaintiff must first create a presumption of illegal discrimination by establishing a prima facie case, (2) the defendant must then rebut that presumption by establishing a legitimate, nondiscriminatory reason for the employment action, and (3) the plaintiff must then overcome the rebuttal evidence by establishing that the defendant's stated reason is a mere pretext.

*Id.* (citation omitted); *see Alamo Heights*, 544 S.W.3d at 782. If a plaintiff does not establish a prima facie case against a governmental unit or overcome rebuttal evidence, then the trial court lacks jurisdiction and must dismiss the case. *See Garcia*, 372 S.W.3d at 635. "[W]hen jurisdictional evidence negates the prima facie case or . . . rebuts the presumption it affords, some evidence raising a fact issue" is required to survive the jurisdictional plea. *Alamo Heights*, 544 S.W.3d at 764. "The causation standard for the *McDonnell Douglas* prima facie case element is not onerous and can be satisfied merely by proving close timing between the protected activity and the adverse action." *Univ. of Tex. Health Sci. Ctr. at Hous. v. Carroll*, No. 01-23-00014-CV, 2024 WL 3417051, at *12 (Tex. App.—Houston [1st Dist.] July 16, 2024, pet. denied) (mem. op.) (citing *Alamo Heights*, 544 S.W.3d at 782). Even so, when an employer provides evidence of a legitimate reason for the adverse action, the employee must prove the adverse action would not have occurred

"but for" the protected activity. *Id.*; *see also Alamo Heights*, 544 S.W.3d at 782. "The but-for causation standard is significantly more difficult to prove than prima facie causation." *Alamo Heights*, 544 S.W.3d at 782 (citing *Strong v. Univ. Healthcare Sys., LLC*, 482 F.3d 802, 808 (5th Cir. 2007)); *Carroll*, 2024 WL 3417051, at *12.

## B. Disability Discrimination

### 1. Elements and Means of Proving a Claim

To establish a prima facie disability-discrimination claim, Donavan must show: (1) he has a disability; (2) he was qualified for his job; and (3) he suffered an adverse employment decision—here, that TSTC terminated him—because of his disability. *See Lara*, 625 S.W.3d at 61; *El Paso Cnty. Water Improvement Dist. No. 1 v. Trevizo*, 697 S.W.3d 259, 272 (Tex. App.—El Paso 2023, no pet.). In the trial court and on appeal, TSTC challenged the first and third elements of the prima facie disability-discrimination claim, specifically whether Donavan had a disability, and that the adverse employment decision was because of the disability. It did not challenge whether he was qualified for the job.

Donavan asserts there is direct evidence he was terminated "because of one of the side effects and coping mechanisms of that disability." He contends that "closing his eyes and meditating resulted directly from his disability," and since he asserts that he was not sleeping, "the discharge for the meditation event would be

'because of his disability.'" In essence, Donavan claims TSTC terminating him for meditating under the mistaken belief he was sleeping, constituted direct evidence of disability discrimination. Here, there is no evidence that anyone at TSTC made disparaging comments about his disability or others in a protected class. *See Donaldson*, 495 S.W.3d at 433 (citation omitted) (explaining what constitutes direct evidence of discrimination); *Jespersen*, 390 S.W.3d at 653–54 (same). Multiple inferences are needed for the evidence to be probative of discriminatory animus: (1) that TSTC knew Donavan's "side effects" included nausea, dizziness, and hot flashes before it decided to terminate him; (2) that TSTC knew he was meditating rather than sleeping; and (3) that TSTC knew he was meditating to cope with those side effects. *See Donaldson*, 495 S.W.3d at 433; *Jespersen*, 390 S.W.3d at 653–54. TSTC had four witnesses who observed Donavan sleeping, which is the reason his supervisor gave for terminating him. Even if TSTC's belief was erroneous, and Donavan was truthful when he told Weeden and Contella he was meditating, there is no evidence they knew about this until after they had decided to terminate him. Further, even if we accept Donavan's argument that TSTC knowingly fired him for meditating, such would not be "because of" the claimed disability—nausea, hot flashes, and dizziness. Although he wants to make meditation "a part of his disability," meditation is not "a mental or physical impairment that substantially limits" a major life activity, as alleged here, Donavan's ability to "concentrate." *See*

25

Tex. Lab. Code Ann. § 21.002(6). Rather, it is a conscious activity, albeit one he claims he used to cope with his disability. We conclude this case does not involve direct evidence of disability discrimination.

Having determined there is no direct evidence of disability discrimination, the *McDonell Douglas* framework applies. Absent direct evidence of discrimination, Donavan needed to first create a presumption of illegal discrimination by establishing a prima facie case of disability discrimination under the *McDonnell Douglas* burden-shifting analysis. *See Flores*, 612 S.W.3d at 305. If "jurisdictional evidence rebuts the prima facie case, the entire *McDonnell Douglas* framework is fully implicated, and sufficient evidence of pretext and causation must exist to survive the jurisdictional plea." *Alamo Heights*, 544 S.W.3d at 783. "The absence of a presumption triggers the plaintiff's duty to create a fact question on the ultimate issue"—here, whether discrimination "caused the adverse employment action—to survive a jurisdictional challenge." *Id.* at 784. "The second and third *McDonnell Douglas* steps are part of an integrated evidentiary framework, and exempting them from [the jurisdictional] analysis" would be erroneous. *Id.* at 785.

### 2. Briefing Waiver

Donavan argues on appeal that we should affirm the trial court's order since TSTC failed to address pretext in its opening brief, which is an independent ground for supporting the trial court's order. A brief must "contain a clear and concise

26

argument for the contentions made, with appropriate citations to authorities." Tex. R. App. P. 38.1(i). Even so, briefs must "be liberally, but reasonably, construed so that the right to appeal is not lost by waiver." *Horton v. Stovall*, 591 S.W.3d 567, 569 (Tex. 2019) (per curiam) (citing Tex. R. App. P. 38.9) (other citation omitted); *see also Lion Copolymer Holdings, LLC v. Lion Polymers, LLC*, 614 S.W.3d 729, 732 (Tex. 2020) (citations omitted). We generally "hesitate to resolve cases based on procedural defects and instead endeavor to resolve cases on the merits." *See Lion Polymers, LLC*, 614 S.W.3d at 732 (citing *St. John Missionary Baptist Church v. Flakes*, 595 S.W.3d 211, 213–14 (Tex. 2020) (per curiam)). In assessing whether an issue was waived, we look "not only to the wording of the issue but the argument under each heading" to assess the parties' intent. *Id.* (citation omitted). We prefer that parties independently brief distinct legal theories, but "certain claims and theories can be 'inextricably entwined,' or the evidence and nature of claims may contain overlapping legal theories." *Id.* at 732–33 (internal citations omitted). So, it is essential we look not simply at the wording of parties' issues, but also the arguments, evidence, and citations the parties relied on to determine which issues the parties intended to and actually briefed. *See id.* at 733; *St. John Missionary Baptist Church*, 595 S.W.3d at 214.

In this case involving circumstantial evidence where the *McDonnell Douglas* framework is implicated, TSTC attempts to negate Donavan's prima facie case with

27

evidence, including that it had a legitimate, non-discriminatory reason for terminating him. This evidence not only goes to the "because of" element of his prima facie case, and even assuming Donavan proved his prima facie case, TSTC's evidence that it terminated him for sleeping on the job also goes to the second step of the *McDonnell Douglas* burden-shifting analysis: that it produce evidence of a legitimate, non-discriminatory reason which rebuts Donavan's prima facie case by producing evidence of a reason for its employment actions. In its brief, TSTC's sole issue asks whether the trial court erred in denying its plea "because TSTC had a legitimate non-discriminatory reason for his termination and Donavan failed to establish a prima facie disability discrimination claim[.]"

As the Texas Supreme Court has explained and we noted above, "If jurisdictional evidence rebuts the prima facie case, the entire *McDonnell Douglas* framework is fully implicated, and sufficient evidence of pretext and causation must exist to survive the jurisdictional plea." *Alamo Heights*, 544 S.W.3d at 783. Given that the *McDonnell Douglas* steps are part of "an integrated evidentiary framework," we conclude in this situation the TSTC's rebuttal evidence of a legitimate non-discriminatory reason, results in "inextricably intertwined and overlapping theories." *See id.* at 785 (describing the "integrated evidentiary framework"); *see also Lion Polymers, LLC*, 614 S.W.3d at 732–33 (discussing how courts should construe briefs and issues raised). TSTC also asserts that "[s]leeping

28

on the job is in violation of TSTC's policy and can result in termination." Much of TSTC's briefing focuses on the evidence of Donavan sleeping on the job and that they terminated him for that reason. While its brief is not a model of clarity, examining the evidence TSTC relies on, the issue raised, and legal authorities, we conclude TSTC's briefing implicates the entire *McDonnell Douglas* framework. *See Lion Polymers, LLC*, 614 S.W.3d at 733; *St. John Missionary Baptist Church*, 595 S.W.3d at 214.

### 3. Application

For purposes of our discussion, we assume without deciding that Donavan produced more than a scintilla of evidence that he was disabled to establish his prima facie case of disability discrimination. *See Donaldson*, 495 S.W.3d at 437 (assuming without deciding plaintiff established a prima facie case, then turning to legitimate non-discriminatory reason). Under the *McDonnell Douglas* framework, the burden then shifted to TSTC to produce evidence that it terminated Donavan for a legitimate, non-discriminatory reason. *See Flores*, 612 S.W.3d at 305; *Alamo Heights*, 544 S.W.3d at 782. We have outlined above the evidence that TSTC terminated Donavan for sleeping on the job, including Weeden's testimony, Contella's testimony, and the coworkers' witness statements. Thus, we conclude TSTC met its burden of producing evidence that it terminated him for a legitimate, non-discriminatory reason.

So even assuming Donavan stated a prima facie disability discrimination case based on his termination, any presumption raised by that was rebutted since TSTC produced evidence that it terminated him for sleeping. *See Alamo Heights*, 544 S.W.3d at 790 (explaining that in context of a retaliation claim when assuming that plaintiff first met her burden of establishing a prima facie case, the employer rebutted any presumption that arose with the prima facie case when it produced evidence of performance reasons for termination). Donavan's "burden to raise a fact issue that this explanation is a pretext" and that he "would not have been terminated but for" his disability, "has, therefore, been activated." *Id.* (citation omitted). In other words, since TSTC met its burden of producing evidence of a legitimate nondiscriminatory reason for the termination, any presumption of discrimination raised by Donavan's prima facie case disappeared, and the burden shifted back to Donavan to overcome TSTC's rebuttal evidence by establishing its stated reason is false and a pretext for discrimination. *See Flores*, 612 S.W.3d at 305; *Alamo Heights*, 544 S.W.3d at 782.

Yet taking as true all evidence favorable to Donavan, indulging every reasonable inference, and resolving any doubts in his favor, we disagree that he offered any evidence of a "but for" nexus between his disability and TSTC's decision to terminate him. The record reflects TSTC's knowledge of Donavan's medical conditions and "side effects" were limited to the following:

- Although he claims he was meditating with his eyes closed and head back to deal with his nausea and that Conroy and other co-

30

workers walked in on him while he was meditating, he notes that he responded to them and was available for work; nothing in the record indicates they knew that he was, in fact, meditating or what symptoms he was addressing with the mediation.

- In 2015, Donavan told Conroy he had cancer and was undergoing treatment and "had multiple conversations with individuals in Human Resources" regarding his cancer diagnosis and treatment.

- He also claims that in 2015, he submitted a letter from the doctor diagnosing the cancer to HR by transferring it through campus mail in an envelope.

- Donavan testified that in 2016, during his first poor performance review with Weeden, he told her, "I've had cancer . . .the cancer seems to be fine, but I have a lot of doctors' appointments and I suffer from side effects[.]" He did not testify that he told her what those were. He also testified that he did not tell Weeden he was meditating, because he was in his office "available."

- Donavan testified that his cancer treatments ended in April 2015, and Weeden testified that in November 2016, Donavan told her he had cancer in the past but was in "full remission[.]"

- In his affidavit, he generally claimed that he spoke with Weeden again about his cancer diagnosis in the spring of 2017, without providing any specifics regarding this conversation.

- There was no evidence that Donavan told anyone at TSTC about having high blood pressure or diabetes, although he said he told Conroy and another previous supervisor before his cancer diagnosis that he had hot flashes and dizzy spells.

- In August 2017, he was called in to be terminated after four coworkers witnessed him sleeping on the job, and when he was told this, he disputed that he was sleeping and told them for the first time that he was meditating to help him deal with his "symptoms from his cancer" but Weeden terminated him anyway.

31

- He claims that he would have stopped meditating if Weeden had warned him not to close his eyes and use the meditation process to keep his job and if she refused to help him "find another reasonable accommodation to lessen the impairments I was intermittently suffering during these attacks, like nausea, sweating, dizziness, and others[.]"

- Yet there is no evidence TSTC was aware of these specific symptoms, and Donavan admittedly did not tell TSTC that he was meditating. Donavan conceded in the trial court that the first time he requested an accommodation was in the meeting where he was terminated on August 2, 2017, although he disputed that was the first time he put them on notice of his disability.

Open and obvious disabilities generally include "outwardly visible disabilities like . . . blindness, deafness, or being wheelchair-bound[.]" *Windham v. Harris Cnty., Texas*, 875 F.3d 229, 238 (5th Cir. 2017). When an employee's disability is not open and obvious, the employee is responsible to both 1) identify the disability and 2) suggest a reasonable accommodation. *See Jones v. Tex. Dep't of Pub. Safety*, No. 03-20-00615-CV, 2022 WL 318585, at *15 (Tex. App.—Austin Feb. 3, 2022, no pet.) (mem. op.) (discussing in the context of failure to accommodate); *Dillard v. SNC-Lavalin Engineers & Constructors Inc.*, 629 S.W.3d 692, 703 (Tex. App.— Houston [1st Dist.] 2021, pet. denied); *Avila v. United Parcel Serv., Inc.*, No. 03-18-00233-CV, 2018 WL 4100854, at *8 (Tex. App.—Austin Aug. 29, 2018, pet. denied) (mem. op.). In sum, Donavan offered no evidence that TSTC knew about his "disabilities" as alleged, "substantially impairing/limiting side effects, including nausea, hot flashes, sweating, dizziness, [and] cramping" caused by his prostate

cancer, high blood pressure, and diabetes before it decided to terminate him. A careful examination of the record shows that while TSTC knew he had cancer in 2015, they also knew he completed treatment in April 2015, and in 2016 he expressly told Weeden that "the cancer seems to be fine." Additionally, despite Donavan's contention that Conroy walked in on him meditating, there is no evidence she recognized that he was meditating.

Although notice is not an element of a prima facie case of disability discrimination, TSTC's lack of knowledge of Donavan's disability until after it had decided to terminate him for sleeping makes it difficult when the burden shifts back to him under this framework. Under the pretext step of the analysis, Donavan must prove that "but for" his disability TSTC would not have taken adverse employment action. "A plaintiff may meet this burden by presenting evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence." *Gosby v. Apache Indus. Servs., Inc.*, 30 F.4th 523, 527 (5th Cir. 2022) (citation and internal quotations omitted). Donavan asserts that evidence of pretext includes TSTC's failure to follow its policies, TSTC's excuse was false, inaccurate statements to governmental agencies and "papering the file," and TSTC's shifting or inconsistent reasons. We take each of these in turn.

First, Donavan complains that the TSTC failed to follow its "Accelerated Process" for termination since that policy required the supervisor to suspend the

employee pending a complete investigation before terminating the employee. This argument lacks merit. TSTC's policy states

> Although the principle of corrective action found in this policy is not required for employees, it is encouraged as a good management practice when practicable. In addition, even if corrective action is chosen, not every step must be taken in each case. This regulation is for guidance purposes only and is specifically not intended to create any right to notice and opportunity for a hearing. Failure by TSTC to follow the procedural steps outlined in this regulation will not form the basis of any employee's complaint or grievance.
> . . .
> **Acceleration of the Corrective Action Process to Termination**
> The corrective action process may be accelerated and an employee may be terminated for a single occurrence or violation of TSTC policy without having been previously warned. Once campus administration has approved, supervisors should suspend the employee pending a complete investigation of the situation before terminating the employee. The investigation shall be performed by Human Resources. Any termination of this nature must be reviewed with the Vice Chancellor or his or her designee in conjunction with campus administration before the termination.
>
> Where the supervisor feels an employee should be terminated immediately, the supervisor should:
> 1. Immediately inform campus administration and Human Resources of the circumstances[;]
> 2. Advise the employee that he or she is suspended; and
> 3. Request the employee immediately leave the premises.

Hoekstra testified that under the acceleration policy, the purpose of suspending the employee was to allow for HR to "do its due diligence" and investigate. Hoekstra agreed, however, that if, after contacting HR, Weeden did not immediately suspend Donavan, she did not go in sequence. Donavan also contends that Contella needed to investigate him since she was the HR representative. Contella did investigate by

34

asking Weeden if there were any other witnesses, and if so, instructing her to obtain statements, which they collected and reviewed. Based on the written statements from four eyewitnesses, they felt had sufficient evidence to terminate Donavan. While Donavan argues that they did not investigate since they did not talk to him, nothing in the record shows investigating the matter required TSTC to speak with him as part of the investigation when it had already gathered facts from four eyewitnesses. Further, if the suspension's purpose was to allow for an investigation as Hoekstra testified, there was no need to suspend Donavan since TSTC had completed its investigation once it obtained the witness statements.

Second, Donavan contends that TSTC's reason for terminating him was false, which was further evidence of pretext. "Texas and federal courts have consistently held that at the pretext stage the issue is not whether the employer was wrong in its belief or process, but whether the asserted reason for its action was honest." *Jones*, 2022 WL 318585, at *20 (citations omitted) (collecting cases); *see also Alamo Heights*, 544 S.W.3d at 792 ("The issue is whether the employer's perception of the problems–accurate or not–was the real reason for [the adverse employment action]."). Since Donavan admittedly did not tell TSTC that he was meditating until after they had decided to terminate him for sleeping, they had no reason to believe their basis for the adverse employment action was wrong. *See Alamo Heights*, 544 S.W.3d at 792; *Jones*, 2022 WL 318585, at *20.

35

Third, Donavan claims that TSTC's inaccurate statements to governmental agencies and "papering the file" constitute evidence of pretext. An employer's attempts to paper a file by manufacturing steps in the disciplinary process by issuing written warnings after it decided to terminate an employee may be considered evidence of pretext. *See Houston v. Tex. Dep't of Agric.*, 17 F.4th 576, 584 (5th Cir. 2021). This is not such a case. As we have outlined above, nothing in the record shows that Donavan told anyone at TSTC that the "side effects" he experienced included nausea, dizziness, hot flashes, and cramping that impaired his ability to concentrate and were caused by his cancer. TSTC's position statement to the TWC is consistent with that, and Weeden's statement considered in the context that Donavan had told her he had cancer in the past "which seems fine" is consistent with her disavowing knowledge of a disabling medical condition until the time of his termination. Donavan testified that Weeden gave him a copy of a typed termination letter at the meeting stating he was being terminated for sleeping, which he signed. The letter was already prepared *before* he told them he was meditating due to his nausea. Additionally, TSTC obtained written statements from four eyewitnesses who saw Donavan sleeping and reviewed them *before* terminating him. This is inconsistent with his claim that TSTC papered the file to cover their tracks after the fact.

Fourth and finally, Donavan argues that TSTC's shifting or inconsistent reasons for his termination provide evidence of pretext. As evidence of TSTC's "shifting" reasons, Donavan notes that they have moved from sleeping to other performance related issues to support his termination. We disagree that the evidence, examined in context, shows inconsistent reasoning. The evidence shows that Donavan received a poor performance evaluation in November 2016, that Weeden attempted to work with him by having him work on "less sensitive" assignments, but he could not successfully complete a task. About six months after receiving the poor evaluation, multiple coworkers reported him sleeping on the job. Weeden testified that given the poor performance evaluation and issues, the fact that he was caught sleeping on the job was something they felt warranted immediate termination. Sleeping on the job after having performance issues helped to explain TSTC's rationale for terminating him rather than pursue another form of discipline, thus providing evidence necessary to show context, which we cannot ignore when reviewing the evidence in the light most favorable to Donavan. *See Alamo Heights*, 544 S.W.3d at 771.

Considering the foregoing, and assuming without deciding, that Donavan established his prima facie disability discrimination claim, we conclude: (1) TSTC rebutted any presumption of discrimination that arose by producing evidence of a legitimate, nondiscriminatory reason for terminating Donavan; and (2) when the

37

burden shifted back to Donavan, he failed to establish that TSTC's proffered reason was pretextual and his disability was the "but-for" cause of his termination. *See id.* at 782; *Carroll*, 2024 WL 3417051, at \*12.

## C. Failure to Accommodate

### 1. Applicable Law

The prima facie elements of a failure to accommodate claim and the elements of a disability discrimination claim overlap. *Tex. Health and Human Servs. Comm'n v. Mitchell*, No. 03-22-00665-CV, 2024 WL 4629162, at \*14 (Tex. App.—Austin Oct. 31, 2024, pet. filed) (mem. op.); *Texas Dep't of Fam. & Protective Servs. v. Howard*, 429 S.W.3d 782, 789 (Tex. App.—Dallas 2014, pet. denied). To prove failure to accommodate, an employee must establish that (1) he has a "disability," (2) the employer had notice of the disability, (3) the employee could perform the "essential functions" of the position with "reasonable accommodations," and (4) the employer refused to make such accommodations. *Mitchell*, 2024 WL 4629162, at \*14; *Trevizo*, 697 S.W.3d at 276.

An employee who needs an accommodation because of a disability is responsible for informing his employer. *E.E.O.C. v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 621 (5th Cir. 2009); *see also Jones*, 2022 WL 318585, at \*15; *Dillard*, 629 S.W.3d at 704; *Avila*, 2018 WL 4100854, at \*8. "The employee must explain that the adjustment in working conditions or duties she is seeking is for a medical

condition-related reason," but does not have to mention the TCHRA, ADA or use the phrase "reasonable accommodation." *Chevron Phillips Chem. Co.*, 570 F.3d at 621. "Where the disability, resulting limitations, and necessary reasonable accommodations, are not open, obvious, and apparent to the employer," the employee has the initial burden "to specifically identify the disability and resulting limitations, and to suggest the reasonable accommodations." *Id.* (citation omitted). It is only when the employee makes such a request that an employer has the duty to engage in an "interactive process." *See id.* "When an employee requests an accommodation for the first time only after it has become clear that an adverse employment action is imminent, his notice of disability is not timely." *Dillard*, 629 S.W.3d at 704 (citing *Jones v. Nationwide Life Ins. Co.*, 696 F.3d 78, 90 (1st Cir. 2012)).

### 2. Application

Donavan admittedly did not tell TSTC he was meditating or needed to meditate to cope with his nausea until the termination meeting. Instead, he asserts that TSTC had a duty to engage in an "interactive process" and accommodate his "known" limitations. We have also already explained that nothing in the record shows Donavan notified TSTC of the disabilities as alleged his petition, which were not open and obvious. *See Windham*, 875 F.3d at 238 (5th Cir. 2017) (explaining that open and obvious disabilities generally include outwardly visible disabilities

39

like being in a wheelchair, blind, or deaf). Since Donavan's disabilities, as pleaded, were not open and obvious, he had the duty "to specifically identify the disability *and* resulting limitations, *and* to suggest the reasonable accommodations." *See Chevron Phillips Chem. Co.*, 570 F.3d at 621 (emphasis added). The record establishes that although he told Weeden he had cancer previously, he also told her it seemed fine, and he completed treatment in 2015. Despite amorphous mentions of side effects, there is nothing to indicate he ever specified before he was called into the termination meeting: (1) what those side effects were; (2) the resulting limitations; or (3) suggested reasonable accommodations. *See id.*

Since Donavan did not notify TSTC of his disability by identifying the disability, the resulting limitations, and suggested accommodations, we conclude he has failed to establish a prima facie case for his failure to accommodate claim. *See id.* (explaining what an employee must notify the employer of); *see also Mitchell*, 2024 WL 4629162, at *14 (outlining elements of prima facie failure to accommodate claim); *Trevizo*, 697 S.W.3d at 276 (same).

We have determined that TSTC rebutted Donavan's prima facie case of disability discrimination by producing evidence of a legitimate, nondiscriminatory reason for its termination, and that when the burden shifted back to him, Donavan failed to conclusively establish this reason was pretextual and his disability was the but-for cause of his termination. We have also determined that since Donavan failed

40

to timely notify TSTC of his disability and suggest a reasonable accommodation, he failed to establish a prima facie case of failure to accommodate. Therefore, we sustain TSTC's sole issue.

## V. Conclusion

Having sustained TSTC's sole issue, we reverse the trial court's order denying TSTC's Plea to the Jurisdiction and Motion for Summary Judgment as to both the disability discrimination claim and the failure to accommodate claim and render judgment dismissing Donavan's claims.

REVERSED AND RENDERED.


W. SCOTT GOLEMON
Chief Justice

Submitted on January 24, 2025
Opinion Delivered May 15, 2025

Before Golemon, C.J., Wright and Chambers, JJ.

41